HITCHCOCK v. AMERICAN PLATE GLASS CO. et al.

(Circuit Court of Appeals, Third Circuit. July 22, 1915.)

No. 1883.

PATENTS ⬤⟶328—VALIDITY AND INFRINGEMENT—PROCESS AND APPARATUS FOR
GRINDING PLATE GLASS.

The Hitchcock patent, No. 1,056,416, for a method of applying abrasives
to apparatus for grinding plate glass, by which the sand is graded as to
fineness for use in the successive grindings, discloses a process novel in
practice, useful in result, and inventive in character, and is valid, as is
also patent No. 1,056,415, to the same patentee, for apparatus for practic-
ing the process. Both patents also *held* infringed.

Appeal from the District Court of the United States for the West-
ern District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by Halbert R. Hitchcock against the American Plate
Glass Company and James W. Cruikshank. Decree for defendants,
and complainant appeals. Reversed.

For opinion below, see 216 Fed. 766.

Christy & Christy, of Pittsburgh, Pa., and F. P. Fish, of Boston,
Mass., for appellant.

C. M. Clarke and F. W. H. Clay, both of Pittsburgh, Pa., for ap-
pellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit
Judges.

BUFFINGTON, Circuit Judge. In the court below Halbert K.
Hitchcock filed a bill against the American Plate Glass Company and
James W. Cruikshank, charging them with infringement of four pat-
ents, viz.: No. 934,442, granted September 21, 1909, for grinding ap-
paratus; No. 934,612, of same date, for grinding apparatus; No.
1,056,415, of March 18, 1913, for apparatus for applying abrasives to
grinding apparatus; and No. 1,056,416, of same date, for method of
applying abrasives to grinding apparatus. On final hearing the court
below, in an opinion reported at 216 Fed. 766, held the defendants
did not infringe. From a decree dismissing his bill, Hitchcock ap-
pealed.

The case concerns grinding plate glass. Such glass is first cast in
large rough sheets, after which such sheets are imbedded in plas-
ter of paris on the table of a large grinding machine, and are ground
smooth by the use of sand as an abrasive. Rough, coarse sand is used
for the first stage of grinding, and sands of finer grades are successive-
ly used as the surface becomes more finished, until the glass is ready
for polishing, which is done by the use of other materials not here
involved. But not only is sand of different fineness required as the
grinding process goes on, but such sand must be applied with such

volume of water as will, on the one hand, give the fluidity necessary to insure diffusion of the sand over the grinding table, but, on the other hand, it is necessary to avoid such fluidity as will wash the sand from the grinder. The present case involves a process and apparatus for mechanically separating the sand into the different grades of fineness required at successive grinding stages, and of feeding such grades in proper fluid condition to the grinding table as such grades are needed. The grinding machines used by both parties are alike, and are not involved in the present case, further than that a general description of them is necessary to a proper understanding of the sand-selecting and sand-feeding devices used by the patentee and the alleged infringer.

As stated above, the cast glass sheets are placed on a large, circular, revoluble, grinding table, and are securely held in place by imbedding them in plaster of paris. Above the table is a cross-beam, from which depend large runners, on the underside of which are cast iron shoes or blocks, which rest loosely on the surface of the imbedded glass. When the table is rotated at high speed, and sand and water are thrown upon it, the runners are rotated frictionally by the table, and an abrasion sets in, which gradually grinds the glass to a smooth surface adapted for the subsequent operation of polishing. Prior to Hitchcock's devices the practice was to shovel coarse, ungraded sand into a V-shaped trough, which was above and inclined to the table. This sand was washed by a hose onto the table. A gutter surrounded the table, into which the sand and water, as the grinding proceeded, were carried by the rotation of the table. From this gutter the mixed water and sand ran into a trough in which were several cross-barriers, which, as the mixture passed, trapped the heavier and larger grains of passing sand, while the lighter grains passed onward. Such sand grading was not uniform. In the first grinding operation, called facing, ungraded, coarse sand was carried to the grinding table by simply turning on a hose. In the several subsequent operative stages clear water was turned on the table, and the finer grades of sand were thrown on in handfuls by the operative. The expense, efficiency, and character of the product depended on the skill and care of the operatives. There was no product uniformity.

Beyond the first barrier in the trough was usually placed a second, which served to trap a second body of sand from the passing water. This was called "canal sand." After the facing operation, which usually took an hour or more, was finished, the glass and runners were carefully drenched with clear water to remove all coarse sand, and then, while a stream of clear water continued to play on the glass, operatives threw handfuls of "canal sand" on the table. This use of proper quantities of canal sand constituted the second step of the process. Beyond the "canal sand" barrier, the trough from each individual grinding table led to a common trough, which received the currents of water and finer grains of sand from all the tables of the plant. This common trough led to what was called the "fine sand house." This latter had a long, rectangular basin, or pair of basins,

communicating with the trough at one end and having an overflow at the other. This basin was divided by overflow barriers into several compartments of substantial length and about three feet deep. In these compartments the sand was caught in successively finer grades as the water passed over the barriers. These different grades were shoveled into separate bins and were used in successive smoothing operations, being thrown in handfuls upon the watered glass surface as in case of the "canal sand"; that is, after the "canal sand" operation was completed the tables and runners were again carefully drenched with clear water, after which the coarsest "sand house" sand was then thrown on for the first smoothing operation. After about 10 minutes the table and runners were again drenched, and the second grade of "sand house" sand was used. After about the same time the tables and runners were again washed off, and the finest grade of "sand house" sand was thrown on and used. This completed the sand-grinding operation. It will be observed that in this process the velocity of the water at the particular instant, and not alone the weight of a particular sand particle, determined whether such particle would or would not be carried over the barrier it was approaching; and it will further appear that the velocity of the water was affected by the amount of sand over which the water passed in the several compartments being deep or shallow. It will also be apparent that the presence of the finer grades of sand on the table during the facing operation was no help, and indeed a hindrance, to the effectiveness of the grinding sand. It is also apparent that, where coarse grains were carried over to the finer grades, such coarse grains might score and scratch the glass in the smoothing operations. In that regard the proof is:

"As the water containing sand in suspension passed through this ditch, the coarse grades would settle out in the first compartment, and the fine grades in the succeeding compartments. The settling, however, had a fatal defect; for, when the pits were empty to start with, there was a current of water and sand 2½ feet deep, while, when the pits were filled, there was a current of only about 4 inches flowing across the pits. This resulted in the first pit filling up much more rapidly than the succeeding ones, and a great quantity of very fine sand and mud being entrapped in the first compartment."

This defect was so serious that resort was had to a partial corrective, by use of what is called a "laxiavator." The proof in that regard is:

"In order to partially overcome this difficulty, there was provided what is called a laxiavator. The sands were shoveled out of the pits in the fine sand house into water contained in this laxiavator, where they were thoroughly agitated, and the mixture was then allowed to settle for approximately eight or ten minutes. Then the water and sand above an opening in the side of the laxiavator was drawn off through the opening into a settling box, where the sand settled and the water was afterward removed. The mixture thus withdrawn was in large proportion fine sand, but had some of the coarser grades contained in it. The laxiavator was then again filled with water and sand, and after agitation the sand was allowed to settle for perhaps three minutes, after which the mixture above the opening was withdrawn into another box; the sand settling in this box and the water being again removed. The

operation was then again repeated, with a settling period of a minute or a minute and a half, and the sands above the opening, which were the coarsest of the three grades, were drawn off into a third box. Thus were obtained the three grades of finishing sands to which I have alluded."

The practice of using ungraded sand in the first or facing operation resulted in the objectionable effects due to particles of pure quartz or shot. In that regard the proof is:

"The continuous shoveling of the sands into the hoppers and washing them out resulted in the shot remaining behind each time, while the finer and better grades of sand were washed out first. When the hoppers were washed out just previous to starting the finishing operation, there would be a large accumulation of this coarse shot in the bottom of these hoppers, which, being fed onto the glass when its surface was practically plane, made a very much rougher ground than would have resulted from the average size of the sand grains used in the operation."

So, also, in the finishing process, there was an operative defect due to the process of "sand house" sand selection. In that regard the proof is:

"In the finishing operation there was a defect, in that the fine sands taken from the fine sand house cemented together in a sort of puttylike structure, and the grinders (i. e., the workmen) would not break up these masses, but threw them on the table in large quantities, so that, instead of the grains passing beneath the runners, they were largely thrown in the ditch."

The testimony shows that the use of the proper amount of water, as well as the proper grade of sand, is also a substantial factor in proper grinding. In that respect the proof is:

"As to the function of the water in grinding plate glass, the grinding apparatus crushes and breaks up the sand, and it is necessary to get rid of this pulverized sand in order to present a clear surface for the fresh sand to work on. If the amount of water used is too small, the table is covered with a pasty, sticky abrasive, producing excessive friction on the glass, and tending to loosen it on the table. If too much water is supplied, it softens the plaster of paris, so that the glass is likely to be thrown off the table by centrifugal force. When the glass is water-soaked and loose on the table, it springs up, thereby sucking part of the abrasive under the glass. It being essential, before finishing the surface of the glass, that all the previous grades shall be washed off, this can then not be done thoroughly, and when the runners force the glass down in finishing, some of the coarse grains are expelled from beneath the glass and spoil the finish. It is therefore very important, in order to get a good, smooth glass, that these defects should not occur."

These defects had long existed in the art, but they were regarded as unavoidable evils. Indeed, the patent art discloses no attempt to solve them. In 1904 the complainant, who was a consulting engineer, began experimenting with a view to improving the process of grinding plate glass; his attention having been called "to the great difficulty they had in getting a proper surface on the glass, so that it would polish and give a fine luster, without having defects injuring its commercial value."

Hitchcock testifies he started with the idea that the defects were largely due to inaccurate grading, which he began to and did improve and radically change. He, however, discovered that the difficulty was not alone in grading, but also in feeding the sand. Without en-

tering into a detail description of the protracted stages of advance and improvement shown in his various patents, we may say his work culminated in his apparatus patent, No. 1,056,415, granted March 18, 1913, and his process patent, No. 1,056,416, of like date. The radical nature of Hitchcock's departure from the prior art consists in his substitution as a sand-assorting agency of a vertical water flow in a confined channel for the horizontal water flow in an unconfined channel of the old practice. These changes he made possible by substituting for the trough of the old art a conical chamber with a vertical stream. This conical structure he disclosed in the auxiliary sand grader shown in the accompanying figure, taken from patent No. 934,441 of September 21, 1909:

This patent is not here in issue, but we refer to it as illustrative of the efforts to solve recognized defects in the plate glass grinding art, as throwing light on the radical step which Hitchcock took from previous practice in the evolution of his perfected machine, and because the working of the vertical current quoted below is by reference embodied in the process patent here in issue. Such workings of a vertical stream and the effect of the confined channel of a cone in sand selection are pointed out in this patent as follows:

"The process may be carried out in a number of ways with the above-described apparatus, one of which is as follows. The pit 7 being filled with a mixture of material and water, steam is admitted to the pipe 12, thus sending a stream of water upward through the pipe 8 and tank 1, and the particles gradually rise until they reach the positions at which they are in equilibrium. These positions of equilibrium lie at the points at which the upward velocity of the water from the pipe 8 equals the velocity at which the particles would normally fall through the fluid if there were no upward flow. It will be seen that the velocity of flow through the tank decreases as the distance from the bottom of the tank increases, because of the increased area of the tank at the higher levels, and also from the greater tendency of the larger particles to reduce the interstitial spaces, this in itself increasing the velocity of flow at the lower levels, and that such velocity is inversely proportional to the area of the said interstitial space at any given point. As the falling velocity of a particle depends upon the ratio of its weight to the surface which is exposed to the resistance of the water, and this ratio for materials of substantially the same specific gravity increases with the weight of the particles, the particles of material composing the contents of the tank will arrange themselves in a series of grades with the average size and weight diminishing and the interstitial area increasing as the distance from the bottom of the tank increases. The inflow of water through the pipe 8 is

continued until a certain predetermined density of the mixture in the tank as indicated by the hydrometer is secured, at which time the valve 9 is closed and the valve 11 opened, admitting water under pressure from the main, which flow of water from the main is necessary to maintain the particles already in equilibrium at their proper height, and to carry to their proper positions the finer particles last carried in from the pit and mixed through the tank; it being understood that the flow of water with the valve 11 open is preferably the same as that which occurs when the valve 9 is open, in which case one flow takes the place of the other. The upper valve 15 is opened and the contents of the stratum above the pipe 5 is withdrawn through such pipe 5, after which the next lower stratum is drawn off, and then the next, until the tank is emptied. The various strata withdrawn are conducted to proper receptacles for settling. This withdrawing operation continues until all the material in the tank is withdrawn, at which time the valve 11 is closed and the operation of filling the tank and securing the proper stratification of the various grades of material is repeated. It will be apparent that all of the material in any stratum is not of exactly the same degree of fineness, but that the difference between the finest and coarsest material in the stratum is fixed between predetermined limits. The proportions of the tank and the flow through the pipe 8 are so arranged that none of the material, which it is desired to save will pass out of the overflow 6, which overflow 6 carries off, however, the mud which is mixed with the material or particles too fine for use, and the surplus water introduced into the tank."

It will be noted that this device had to be emptied and then refilled. But in the perfected machine of his later patents Hitchcock embodied and utilized the upward stream and the conical vessel with other features, so as to secure an automatic cycle of continuous operation in which the conical graders, instead of being emptied and refilled, were in continuous operation. With this perfected machine which we will now describe, we are satisfied, the plate glass grinding art passed from the old inaccurate method of sand grading and the old method of sand hand feeding to an automatic method of effective, uniform machine grading and machine feeding, which brought about uniform and better results. Hitchcock's perfected machine is shown in the accompanying drawings:

FIG. 1.

Without entering into details it will be noted that there are three grinding tables, each provided with a conical coarse sand grader 5, and a conical fine sand grader 14. Each table is surrounded by the usual gutter connected to a common ditch 8, through which the already used and mingled sand and water flows to the sump pit 9, through the screen 8a. Near the sump pit 9 is a conical preliminary grader 4, into the bottom of which is continuously pumped from the sump pit sand and water. In grader 4 the preliminary grading is done, the separated coarse sand and water passing onward in cycle to the individual tables' conical coarse-sand grader 5 through the trough 15 and the separated fine sand and water passing onward in cycle to the same individual tables' conical fine-sand grader 14 through the trough 13. Overflows to allow water and mud to escape are provided for each. Fresh sand is supplied from time to time from hoppers 17 located adjacent to each coarse-sand grader 5. The functional purpose of the machine generally and of its different features are thus set forth in the specification:

"The object of the present invention is to provide apparatus for grading and applying such materials whenever the supply to and the withdrawal of the material from the grading vessel goes on simultaneously; the finer material being held back during the roughening operation for the subsequent smoothing and finishing operation. Further objects of the invention are to provide apparatus whereby the proper ratio of the water to the sand or other abrading material may be regulated. * * * The present invention has for its purpose to provide simpler and less expensive apparatus in which a continuous uninterrupted cycle with the abrading material in suspension or mixed with the liquid is carried on, so that the materials can be handled at less cost and labor than the apparatus shown in my prior patent. * * * Each of the grading vessels 5 is preferably of the shape shown in the drawing—that is, of inverted cone shape—and is adapted to receive the material mixed with water from above. The grading is preferably effected by maintaining in such cone an upward flow of water, whereby the material is divided into various strata, depending upon the ratio of the weight of the different particles of material to the resistance offered to falling down in the upward current of water, all as described in my patent No. 934,441, above identified. The upward flow of water is provided through the lower end of the cone by means of supply pipe 40. The action of the upward flow of water in the conical vessel separates the material into various grades; the coarsest being at the bottom, and successive layers decreasing in coarseness toward the top. * * * In order to separately withdraw the grades from the grading vessel, there are projected into said vessel a series of pipes 42, 43, and 44, in number depending upon the number of grades to be separately withdrawn. The lower inner ends of these pipes are of different heights in the grading vessel, and each ends approximately in the strata or zone of the grade which it is desired to withdraw through that pipe. All of these pipes extend through the side of the cone at substantially the same level, and the outer ends bend down somewhat. * * * It is not necessary to withdraw all the grades lying between any two planes before taking out or beginning to take out the upper or finer grades. This enables the finishing operation to be brought to a speedy conclusion; whereas, with the prior apparatus, where the different grades were withdrawn through a common outlet, it was necessary to entirely withdraw all the grades before the finest could be taken out. * * * The withdrawal through any one pipe can be stopped whenever desired, and any one of the higher pipes opened. This enables the material to be withdrawn in a series of steps or jumps and enables the finishing operation to be started at any time and brought to a speedy conclusion."

The device also automatically mixes proper proportions of sand and water. Such mixture is thus secured:

234

"In the application of abrading material, and particularly for grinding and smoothing plate glass, it is advantageous to vary the amount of water mixed with the sand of various grades. With the coarser grades a small ratio of water can profitably be used, while with the finer grades the ratio of water preferably should increase. In my patent hereinbefore described, this regulation of the ratio of water to the sand for the different grades was secured by means of a float located in a suitable vessel and controlling the valve which controlled the amount of water entering the grading cone. In the apparatus illustrated in this application this regulation is automatically effected without such float and regulating valve by properly proportioning the shape or lines of cone 5 and properly locating the points of withdrawal of the different grades therefrom; that is to say, the different heights at which the withdrawal pipes terminate in said cone. By properly designing the shape of the cone and having the several withdrawal pipes project down into the cone to exactly the right points, I am enabled to automatically and properly regulate the ratio of water to the sand, so as to secure the increasing ratio of water to the sand for the finer grades. This considerably simplifies the apparatus over that illustrated in my prior patents."

It should here be noted, as bearing later on the question of infringement, that the large or preliminary grading cone 4 of Hitchcock's device, while equipped to grade five different grades of sand, only utilizes such selective capacity to the extent of separately withdrawing the finest grade of sand. This latter grade is at once taken away and conveyed to the fine-sand cone. All the other four grades pass from said cone 4 and intermingle in passing to cone 5, where they are regraded and separately withdrawn as needed. As stated in the specification:

"The purpose of taking out of the cone 4 the several independent grades through pipes 70, 71, 72, and 73 is to remove as quickly as possible all of the coarser material and thus insure having the uppermost grades which escape through outlet 12 very carefully selected. As a consequence, a very careful grading or selection of the upper or fine material is secured. Each of the fine sand cones 14, therefore, receives its supply from the (s)top stratum of the preliminary grading cone 4."

The cycle of continuous operation of the apparatus as a whole and the functions and operations of the different parts are thus described in the specification:

"In the use of the apparatus the sand is deposited in hopper 17, is washed out of the same by opening valve 34, and passes, mixed with water, into the grading tank or cone 5, where it meets an upward current of water of gradually diminishing velocity toward the top, and settles down in the water in said tank until it reaches a state of equilibrium, which depends upon the size and physical characteristics of the particles of sand, so that they are thereby divided or separated into several grades or sizes. The grades are withdrawn and conducted separately to the grinding table by opening the appropriate valve 47, 48 or 49, controlling the several withdrawal pipes from said cone. The sand and water from the grinding table escapes into gutter 8 and passes then to sump 9. On the grinding table more or less of the sand is pulverized to a degree of fineness which incapacitates it for further service as an abrasive. The sand, mixed with water, is drawn from sump or pit 9 and discharged upwardly into the preliminary grading tank or cone 4. The stream of water carrying the same up into the cone gradually diminishes in velocity upwardly, and the different particles of sand seek their strata of

equilibrium the same as in the tank or cone 5, and being thereby separated into a series of grades or sizes. The very fine particles, too fine to be of use, scum, dirt, and other impurities, wash out through the overflow 10 to the sewer. The coarser grades of material are withdrawn from this tank through discharge pipes 70, 71, 72 and 73, being returned to the grading table 5, while the finest grade is deposited in the finishing cone 14, to be withdrawn therefrom whenever the grinding operation has reached the stage for the final or finishing operation. During the coarse grinding or roughing, the coarser grades (or even the coarsest grade only) are taken from the vessel or cone 5 to the table, and simultaneously the material from all the grades, except the finest in cone 4, are returned to the cone 5 for regrading, and fresh material is also supplied to the cone 5 from reservoir 17; this supply being controlled by the density of the mixture in the cone 5. When the roughing or facing operation is substantially completed, the supply of material to the cone 5 is cut off by closing valves 34a and 37. The operation then continues with the withdrawal from the cone 5 of the several grades in succession, or by steps or jumps, as above described, and to the extent desired or necessary, the material becoming finer and finer, and after this has been carried far enough, further withdrawal from cone 5 ceases, and the finishing or smoothing is completed by withdrawing entirely from the fine sand cone 14, when, again, the material withdrawn gradually increases in fineness from the bottom to the top. During the rough grinding there is a continuous circulation of the abrading material in water, from cone 5 to the grinding table, thence to pump 9, thence into cone 4, and thence by trough 15 back to cone 5. The portion of material too fine for further use is washed by the overflow into the sewer, and the finest usable grade is conveyed to the fine-sand cone 14 for the finishing operation. Simultaneously therewith fresh material is being added to cone 5 to make up for the fine material washed into the sewer and that taken to the fine-sand cone."

## The specification ends with this general summary of the disclosure:

"With this apparatus there is a continuous and uninterrupted cycle of the abrading material, constantly or practically constantly, in a state of suspension, or at least mixed with water. No storage place is necessary or required, and therefore the labor of handling is reduced practically to a minimum, and the apparatus is of less size and less expensive than where storage must be provided for. The apparatus is so designed that the graded material is withdrawn from the grading tanks and is discharged into said tanks simultaneously; i. e., both operations are going on at the same time, but without interfering with the accuracy of the grading. This does away with the necessity of storage places or tanks, and permits the use of very much smaller and less expensive tanks or cones than with the prior form of apparatus."

The practical value of this device over the old art is evidenced by the defendants' use thereof, by the strenuous effort to justify such use, and by the uncontradicted testimony. In the latter regard the president of the Pittsburgh Plate Glass Company, a licensee of Hitchcock, testified:

"As to any saving of labor and materials brought about by the installation of this apparatus, I have never made figures on that myself; but those in our factories who are in a position to know have estimated the savings at approximately $150,000 a year. In addition to the saving in cost, the product is very much more uniform in finish. * * * There had been in the past year a great deal of trouble through lack of uniformity in finish, due to imperfections in apparatus that had been devised to secure a uniform grading.

This idea appealed to me, because it seemed to me it would provide a uniform condition; the condition could be controlled and maintained uniformly. The original idea that appealed to me was not so much that it was going to save money in operation as that it was going to produce uniform control. Nobody ever has made plate glass of a uniform character, and nobody does do it even now."

After thorough consideration we have reached the conclusion that the process disclosed by Hitchcock in his patent No. 1,056,416 was novel in practice, useful in result, and inventive in character, and that the patent issued to him therefore, as well as patent No. 1,056,415, granted to him for an apparatus for practicing such process are valid.

We turn next to the question of infringement. The charge of infringement of both said process and apparatus patents is predicated on the defendants' use of the device shown in the accompanying drawing:

The upper portion is the grinding machine in common use, and the lower shows the alleged infringing grading and feeding mechanism. These are sunk in the ground, and as the primary is lower than the secondary grader, it will be evident that the sand in the primary grader has to be elevated from one of its compartments to the table and from the other to the secondary grader, and also the mixed sand and water in the several compartments of the secondary grader must be elevated to the tables as needed. The mixed sand and water from the sump pit enters at the upper left-hand corner of the primary

grader, and passes down its left side to the right, around the lower end of partition *28*, thence up the passageway between partitions *28* and *22*, and over the top of the latter partition. From the first compartment of the primary grader such coarse sand as is there needed is pumped through the pipe *75* to the grinding table. From the second compartment such sand and water as have passed the comb of partition *22* are pumped through pipe *76* to the secondary grader, where it enters the first compartment, passes the lower end of partition *50* in compartment *40*, in which latter such sand as is too heavy to rise over the comb of baffler *54* on partition *51* remains in compartment *40* and is pumped to the table as needed through pipe *77*. The remaining mixture of sand and water which passes the comb of baffler *54* continues its flow toward the opening made by partition *50* and the comb of baffler *55* at the top of partition *52*. Such sand as is too heavy to rise over the comb of baffler *55* remains in compartment *41* and is pumped to the table as needed through pipe *78*. The remaining mixture passes over the baffler comb *55* into partition *42* and is pumped to the table through pipe *79*.

In this construction we note, first, that the sand selection agency of the device lies in its vertical water flow. The extension of partition *28* downward and of *22* upward makes a verticle cycle of continuous motion as the normal operation of the grinder requires more sand from the secondary grader. Moreover, such forward movement as there is in the primary grader enters a wider channel at the foot of partition *28*, between partitions *28* and *22*, and between the top of partition *22* and the ground line, than the opening where it entered the chamber between the chamber side *74* and the foot of partition *28*. The same expanded and rising channelway is found in the secondary grader. The cycle passes down the narrow channel between side *49* and partition *50* into the wider opening between the lower end of partition *50* and the floor of the chamber and the gradually widening channel formed by inclined partitions *50* and *51*. From the narrowed opening formed between partition *50* and the baffler *54* of partition *51* the cycle passes to the wider space between partitions *50* and *52*, and through the narrowed opening formed by partition *50* and baffler *55* of partition *52* to the broader space above. In this continuous upward cycle it will thus be noted that, while the cone form is not used, its function of affording broader space in the channel as the vertical movement continues is utilized in defendants' structure by partitions which, in the space left between them in some cases, their inclination in others, and their bafflers in others, secure in the cycle the same ultimate vertical current sand selection as does Hitchcock's conical graders. It will thus be seen that, while the conical form of Hitchcock's apparatus has been dispensed with, the gist and life of his process has been studiously retained by the defendants.

So, also, in the order of sand selection, the change by defendant from Hitchcock's order is one of mere engineering choice. In Hitchcock's apparatus the finest grade of sand is first selected and carried away for use as needed in the cycle of grinder operation, while the

coarser grades are left mingled for further sand selection. In the defendants' device this order is reversed. In it the coarsest grade of sand is first selected and is retained for use as needed in the cycle of grinder operation, while the finer grades are left mingled for further sand selection. But, while this alternative difference in order as to whether the coarse or the fine selection be first made does exist, when it comes to the process of sand selection, which is the gist and soul of Hitchcock's contribution to the art, we find the same sand selection process present in both devices. This formal difference in the mere order of sand selection, namely, whether the first segregation be of coarse or of fine sand, relieves the case of the abstruse discussion as to the storage function of chamber *21* of the defendant. When that apparatus made a coarse-sand selection in the first chamber, it necessarily had to hold that coarse sand until, mingled with water, such coarse sand was needed by the grinder. But in the sense, however, of this being a storage such as occurred in the interrupted old horizontal stream process, this temporary storage of his first selected coarse sand can no more be claimed by the defendant to be a break in the cycle operation which relieves it from infringement than the temporary storage by Hitchcock of his first selected fine sand can be charged against him as breaking the cycle of operation, and therefore shearing Hitchcock of the inventive character of his device.

It is clear that in neither case, in defendant's temporary holding of selected coarse sand and in Hitchcock's temporary holding of fine sand, is there any cycle suspension or any sand storage. In neither case has the sand passed from transit to destination and storage. In both they remain in potential transit; in both are they utilized as they are needed, and when needed are indispensable to cycle maintenance. Of them both it may be aptly said: "They also serve who only stand and wait."

Viewed from all standpoints, we are of opinion the defendants' device utilizes the process disclosed in Hitchcock's process patent, and in using that process it has availed itself substantially of the apparatus which Hitchcock disclosed for utilizing that process. This view of the case renders it unnecessary for us to here discuss the other and minor patents involved in the case.

Without, therefore, passing on them, it suffices to say the practical outcome of this case is sufficiently met by a reversal of the decree entered below, and a remanding of the cause, with instructions to enter a decree adjudging patents Nos. 1,056,415 and 1,056,416 are valid, and claims 3, 6, 9, 15, and 20 of the former, and claims 1, 2, and 6 of the latter, are infringed.